UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

J&R MARKETING, SEP, et al.,

      Plaintiffs,

v.

GENERAL MOTORS CORPORATION, et al.,

      Defendants.

_____/

Case No. 06-10201

Honorable Nancy G. Edmunds

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS [41]**

Pending before this Court is Defendants' Motion to Dismiss, filed on September 26, 2006.  Plaintiff J&R Marketing, SEP, Plaintiff Alex Mager, Plaintiff Milton Brafman, Plaintiff Michael Ramsay, and Plaintiff Stanley Zielezienski (collectively, "Plaintiffs") filed a class action lawsuit against Defendant General Motors Corp. ("GM"), Defendant General Motors Acceptance Corp. ("GMAC"), and individuals who are officers and directors of GMAC,[1] (collectively, "Defendants") claiming that Defendants violated federal securities law in making sales of certain GMAC debt securities to Plaintiffs between July 28, 2003 and November 9, 2005.[2]  Plaintiffs allege that Defendant GMAC and the Individual Defendants violated §§ 11 and 12(a)(2) of the Securities Act of 1933

_____

[1]These include Eric A. Feldstein, William F. Muer, Linda K. Zukauckas, Richard J.S. Clout, John E. Gibson, W. Allen Reed, Walter G. Borst, John M. Devine, Gary L. Cowger, and G. Richard Wagoner, Jr. (collectively, the "Individual Defendants").

[2]Plaintiffs filed their Amended Complaint on July 28, 2006.  (Docket No. 37.)  Any citation to the "Complaint" in this Order refers to the Amended Complaint.

(the "Securities Act"), 15 U.S.C. §§ 77k and 77*l*(a)(2), by making material misstatements as well as failing to disclose information in offering materials for the securities that Plaintiffs purchased.  Plaintiffs also claim that Defendant GM and the Individual Defendants are liable as control persons of GMAC, pursuant to § 15 of the Securities Act, 15 U.S.C. § 77*o*.

In support of the instant motion to dismiss, Defendants assert that (1) Plaintiffs only have standing to sue based upon the registration statement for the particular debt issuance that they purchased shares in, (2) GMAC had no obligation to disclose information about its parent company, GM, in its offering materials, (3) any misstatements of GMAC financial results were either immaterial or did not affect decisions to downgrade GMAC's credit rating, so these could not have caused Plaintiffs' losses, (4) § 12(a)(2) does not apply because Defendants did not sell these securities directly to Plaintiffs, and (5) § 15 provides for derivative liability, so Plaintiffs have no claim here once their §§ 11 and 12(a)(2) claims are dismissed.  For the reasons set forth below, the Court GRANTS Defendants' motion to dismiss, and this case is DISMISSED.

## I.  FACTS

Defendant GMAC is a company in the financial services industry that provides a wide range of financing products, including "financing wholesale and retail automobile purchases for GM dealers and customers, mortgage lending, and commercial and consumer insurance and banking services."  (Defs.' Mot. to Dismiss at 2 (hereinafter, "Defs.' Mot.").)  At all times relevant to this lawsuit, GMAC was a wholly-owned

2

subsidiary of Defendant GM.[3]  (*Id.* n.2.)  The Individual Defendants all are officers and/or directors of GMAC, and signed various registration statements on its behalf for the debt securities issuances that are at issue in this lawsuit.  Of the ten Individual Defendants, six are also senior executives of GM.  (Pls.' Resp. at 1-2.)

Among other financing sources, GMAC issues debt securities like those that Plaintiffs purchased to fund its lending business.  In general, debt securities, or bonds, have a fixed coupon rate of interest that is set prior to issuance.  This gives the security's owner a right to receive periodic interest payments at the coupon rate throughout the life of the security, with the return of principal at its maturity date. (Compl. ¶ 31.)  Although the face value or "par value" of a debt security is the amount that an initial purchaser pays for it, there is often a secondary market for such securities, so that their price (and the associated yield) will fluctuate in the future based upon the market's perception of the issuer's default risk.  (*Id.* at ¶¶ 32-33.)  A security's yield reflects the individual issuer's likelihood of not being able to cover its obligations, also known as its default risk.  The yield is calculated in reference to risk-free securities, thus allowing investors to value a security that is being traded in a secondary market.[4]  (*Id.* at

---

[3]GM is in the process of completing a transaction that will result in private investors purchasing a 51% interest in GMAC.  As Defendants note in their motion to dismiss, however, this transaction is immaterial to the instant lawsuit.

[4]As Defendants note in their motion to dismiss, assume that a company issues individual units of a debt security with a $1,000 par value and a 6% coupon rate, payable annually.  The initial purchaser would pay $1,000 for each unit, and would receive $60 per year in interest.  The initial yield of 6% ($60/$1,000) would equal the coupon rate.  Now assume, however, that the issuer's financial condition worsens, or general market factors become less favorable, and the yield increases to 6.67% to compensate for the issuer's increased default risk.  Since the interest payment of $60 is fixed, the new price for the security would be $60/6.67%, or $900.  Conversely, if the

¶¶ 34-36.)

One way to assess the default risk of a particular security is reviewing publications of various credit rating agencies. These agencies issue recommendations that are based upon investigative underwriting of a particular issuer's credit quality. (Defs.' Mot. at 3.) GMAC's debt securities are rated by such agencies, which include Standard & Poors ("S&P"), Fitch Ratings, Inc. ("Fitch") and Moody's Investor Services, Inc. ("Moody's"). (Defs.' Mot. at 3; Compl. ¶ 40.) By influencing an issuer's yield in the market, credit ratings affect both the coupon rate that an issuer has to offer in order to sell its debt securities in the initial offering, as well as the future prices of the securities in secondary markets. In general, the lower an issuer's credit rating, the higher coupon rate it must offer, (Compl. ¶ 38) so it is in an issuer's best interest to minimize its borrowing costs by maintaining a higher credit rating. (Compl. ¶ 4.)

GMAC's fiscal year ("FY") 2002 10-K report, and many of its other SEC filings, recognized the relationship between credit ratings and coupon rates for its debt securities, and noted that its own credit ratings could be affected by "cash flow and financial resource concerns at the Company's parent, General Motors." (Compl. ¶¶ 20, 41.) The tie to GM affects GMAC in two main ways: (1) GMAC's primary source of revenues is financing GM car dealers' purchases of new vehicles, so a sales decline or other operational difficulties at GM could reduce financing revenues at GMAC, and (2) as 100% owner of GMAC, GM could elect to take a cash dividend, which would reduce

---

yield decreases to 5.45%, the price would increase to $1,100 ($60/5.45%). (Defs.' Mot. at 3 n.3.) Thus, as an issuer's default risk rises, so does the yield on its debt securities, causing a corresponding decrease in the securities' value.

4

GMAC's cash flow position.  (Compl. ¶ 46.)

Of particular importance to debt security investors is an issuer's equity cushion, which represents the difference between the value of a company's assets and its debt. (Compl. ¶ 37; Defs.' Mot. at 6 n.4.)  This is because debt holders typically hold a more senior position than equity holders if a company is unable to meet all of its payment obligations.  Thus, in theory, all of a company's equity value would have to be eroded before debt holders' principal would be at risk.  Therefore, a larger equity surplus will result in higher credit ratings for an issuer's debt securities because of the reduced risk of the company being unable to meet its debt obligations.  Although primarily affected by the value of a company's assets and its liabilities, the equity cushion also incorporates the company's cash flows from operations, as those are an issuer's primary source of debt repayment.

Plaintiffs purchased varying amounts of GMAC debt securities between March 2004 and March 2005 from a single issuance referred to as the "Second SmartNotes." (Defs.' Mot. at 5.)  The registration statement for this offering was filed on September 30, 2003, and was a shelf registration, which allowed GMAC to sell the securities over a period of time rather than all at once.  (*Id.* at 4-5.)  As this case was brought as a class action, the Complaint lists a total of eleven separate debt issuances whose registration statements contained the allegedly misleading or false information, including the Second SmartNotes issuance that the named plaintiffs purchased securities from.  The period of purchases for the alleged class plaintiffs as a whole is from July 28, 2003 to November 9, 2005.

Both parties admit that GMAC disclosed its heavy reliance on GM for financing

5

business, as well as the concomitant impact that GM's own performance and credit rating would have upon GMAC's credit rating.  (Defs.' Mot. At 6; Compl. ¶ 6.)  While the Second SmartNotes offering materials referred to GMAC's other SEC filings, no reference was made to GM's public reports or financial information.

Plaintiffs claim that GM's misrepresentation of its own financial information caused that entity's credit rating to fall, which lowered GMAC's credit rating, causing the yield on GMAC's debt securities to rise, and, finally, lowering the effective market price of GMAC's debt securities which had already been issued.  Plaintiffs also argue that GMAC's failure to disclose this information allowed it to maintain a higher credit rating than it otherwise would have while the securities at issue were sold, effectively lowering the coupon rate that had to be offered on the securities from the outset.

Specifically, Plaintiffs claim that GMAC failed to disclose the following information about GM: (1) that actual operating cash flows were overstated by (a) $4.4 billion in fiscal year FY 2002 and $4.6 billion in FY 2003,[5] (b) $6.8 billion for the first six months of FY 2004,[6] and (c) GM reduced its projected FY 2005 operating cash flows by $4 billion, from a $2 billion surplus to a $2 billion deficit,[7] (Compl. ¶¶ 69-73) (2) that GM's guarantee of Delphi's pension liabilities could be up to $12 billion,[8] (*Id.* at ¶ 85), and (3) credits from suppliers were misapplied that resulted in GM's FY 2001 net income being

---

[5]Both disclosed March 16, 2005 in GM's FY 2004 10-K.

[6]Disclosed July 20, 2005 in GM's second quarter ("2Q") 2005 10-Q.

[7]Disclosed in March 2005.

[8]Disclosed October 8, 2005, after Delphi filed for bankruptcy.

6

$300-400 million (50-75%) over actual levels, had the credits been reported properly.[9] (*Id.* ¶ 91.)

As to GMAC's own results, Plaintiffs assert that it misstated financial information in each of its three quarterly reports during FY 2004 as follows:[10] (1) restated net revenues decreased by $26 million (0.5%), $12 million (0.2%) and $41 million (0.8%) for the first ("1Q"), second ("2Q") and third quarters ("3Q"), respectively, and (2) restated net income decreased by $22 million (2.8%), $14 million (1.6%) and $36 million (5.5%) for the same respective periods.  (*Id.* ¶ 96.)

During this time, GMAC and GM's credit ratings were both downgraded on several occasions.

## II.  STANDARD OF REVIEW - MOTION TO DISMISS

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a Complaint. In a light most favorable to Plaintiff, the court must assume that Plaintiff's factual allegations are true and determine whether the Complaint states a valid claim for relief. *See Albright v. Oliver*, 510 U.S. 266 (1994); *Bower v. Federal Express Corp.*, 96 F.3d 200, 203 (6th Cir. 1996); *Forest v. United States Postal Serv.*, 97 F.3d 137, 139 (6th Cir. 1996).

This standard of review "'requires more than the bare assertion of legal conclusions.'" *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 400 (6th Cir. 1997) (quoting *Columbia Natural Resources, Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir.

---

[9]Disclosed November 9, 2005 in GM's Form 8-K filing with the SEC.

[10]All disclosed March 14, 2005 in GMAC's Form 8-K filing with the SEC.

7

1995)). The Complaint must include direct or indirect allegations "respecting all the material elements to sustain a recovery under *some* viable legal theory." *See In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993) (citations omitted). A court should not grant a 12(b)(6) motion unless the movant shows "beyond doubt that the plaintiff can prove no set of facts in support of his claim." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

## III.  ANALYSIS

### A. Standing Under §§ 11 and 12(a)(2) of the Securities Act

Plaintiffs claim that Defendant GMAC and the Individual Defendants violated § 11, which provides, in relevant part:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security . . . may, either at law or in equity, in any court of competent jurisdiction, sue--
>
> (1) every person who signed the registration statement;
>
> (2) every person who was a director of . . . the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;

15 U.S.C. § 77k(a).  Plaintiffs also assert a violation of § 12(a)(2):

> [Any person who] offers or sells a security . . ., by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading . . . , shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction . . . .

15 U.S.C. § 77*l*(a)(2).

Defendants' standing argument focuses on the fact that courts have interpreted

8

the provisions of §§ 11 and 12(a)(2) to limit standing to those individuals who actually purchased securities that were related to the *particular* registration statement or prospectus that contained a misleading statement of fact or omission. *See Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 495 (5th Cir. 2005) (limiting "putative [§ 11] plaintiffs to the 'narrow class of persons' consisting of 'those who purchase securities that are the direct subject of the prospectus and registration statement.") (quoting *Barnes v. Osofsky*, 373 F.2d 269, 273 (2nd Cir. 1967)); *Ackerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 344 (2nd Cir. 1987) (same result under § 12(a)). Therefore, Defendants assert that Plaintiffs only have standing to sue for misstatements or omissions contained in the registration statement and prospectus for the Second SecuredNotes, and not the additional ten issuances listed in the Complaint, as Plaintiffs admit that they only purchased securities from the Second SecuredNotes issuance.

In response, Plaintiffs cite a plethora of cases to support their position that the instant situation should be viewed differently because it is a potential class action. Plaintiffs argue that all named plaintiffs need not have purchased securities from each of the offerings that were affected by the same misrepresentation or omission in order to assert the rights of putative class members who may have actually purchased securities in those other offerings. (Pls.' Resp. at 27-28.) A review of these cases discloses, however, that two did not even involve securities law, and others focused on issues of a class representative's ability to adequately represent other members of the class, rather than the threshold standing issue before this Court.[11] Finally, Plaintiffs' argument that *In*

---

[11]Although Plaintiffs placed heavy reliance on *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 421-24 (6th Cir. 1998) at oral argument, that case is inapplicable here

*re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d. 477, 497 (S.D.N.Y. 2004) supports

its position is expressly refuted by a later part of that opinion confirming that, in a

securities case, "the selection of lead plaintiffs does not remove the basic requirement

that at least one *named* plaintiff must have standing to pursue each claim alleged." *Id.*

at 496 (emphasis in original).

The Court finds that the relevant issue was squarely addressed in *Ong v. Sears,*

*Roebuck & Co.* 388 F. Supp. 2d 871, 891-92 (N.D. Ill. 2004):

> Plaintiffs lack standing to sue on their own behalf with respect to the 3/12/02
> and 5/21/02 Offerings since they never purchased any securities in those
> offerings. [The named *Ong* plaintiffs only purchased securities in the 6/21/02
> offering.]  *The fact that they have filed a class action lawsuit that includes
> putative class members who did purchase the relevant securities does not
> confer the necessary standing in this case because none of those putative
> class members is a named plaintiff.*  Thus, Plaintiffs' claims with respect to
> the 3/12/02 and 5/21/02 Offerings are dismissed without prejudice to their
> naming additional plaintiffs with the requisite standing.

(citations omitted, emphasis and explanatory text added).  The Complaint here suffers

from the same deficiency, in that the named Plaintiffs only purchased securities from the

Second SmartNotes offering.  The fact that Plaintiffs assert that Defendants "engaged in

a common course of wrongful conduct that injured Plaintiffs and other members of the

putative class in a substantially similar manner" (Pls.' Resp. at 29) is insufficient to

create standing in light of clear statutory language and legal precedent to the contrary.

Defendants' motion is GRANTED with regards to Plaintiffs' claims relating to the other

ten offerings besides the Second SmartNotes, and these claims are DISMISSED for

_____

because it only discussed Article III standing and certification of a class action under
Rule 23 of the Federal Rules of Civil Procedure.  Nothing in *Fallick* addressed the issue
at bar here, namely, whether Plaintiffs have *statutory standing under the Securities Act.*

lack of standing.

### B. Misrepresentation or Omission of Material Facts–§§ 11 and 12(a)(2)

As noted above, §§ 11 and 12(a)(2) prohibit an issuer from affirmatively misstating or omitting a material fact related to a particular issuance of securities.[12]  In order to be actionable under either section of the Securities Act, any omitted material fact must have been required to be disclosed under the law, or disclosure would have been made necessary in order to ensure that other statements in the filing were not misleading. Plaintiffs claim that Defendant GMAC and the Individual Defendants violated §§ 11 and 12(a)(2) by both (1) omitting certain GM financial information in GMAC's filings,[13] and (2) misstating GMAC's financial information in those same filings.  Both parties recognize that a defendant has virtually strict liability for any misrepresentations or omissions under §§ 11 and 12(a)(2)(2).

#### 1. Failure to disclose GM's financial information

Defendants argue that Plaintiffs have failed to state a claim under §§ 11 and 12(a)(2) for GMAC's omission of GM's financial information from its SEC filings because (1) GMAC was not required to disclose financial information about its parent company, and (2) failure to disclose GM's financial information did not make any of GMAC's other statements misleading.  Defendants do not dispute Plaintiffs' assertion that the GM

---

[12]These provisions prohibit essentially the same conduct, except that § 11 governs registration statements, while § 12(a)(2) covers statements made in a prospectus.

[13]Namely, that (1) GM's cash flows from operations were overstated from 2003 to 2005, (2) its pension obligations to Delphi could be as high as $12 billion, and (3) GM improperly booked supplier credits, resulting in 2001 net income being overstated.

11

financial information at issue was material.  Although Plaintiffs Response to Defendants'

Motion to Dismiss treats both of these issues in one section, they are separate avenues

to liability under the Securities Act, so the Court will address them in turn.  The issue of

a wholly-owned subsidiary's duty to disclose financial information of its parent company

is apparently an issue of first impression.

### a. GMAC had no duty to disclose GM's financial information

The Sixth Circuit has indicated that a duty to disclose could arise in situations

where (1) insider trading is involved, (2) a statute or regulation mandates disclosure, or

(3) disclosure is necessary to correct an otherwise misleading statement.[14]  *City of*

*Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669 (6th Cir. 2005)

(citing *In re Digital Island Sec. Litig.*, 357 F.3d 322, 329 n.10 (3rd Cir. 2004)).  The duty

that applies in any case is dependant upon the particular facts and circumstances

involved, as some courts have recognized that this is not an exhaustive list.  *Shaw v.*

*Digital Equip. Corp.*, 82 F.3d 1194, 1202 n.3 (1st Cir. 1996).  Although a key purpose of

the securities laws is encouraging disclosure, it is nevertheless important to place

reasonable limits on what must be disclosed, as a disclosure regime that is too

expansive would simply "'deluge investors with marginally useful information.'" *City of*

*Monroe*, 399 F.3d at 669 (quoting *In re Sofamor Danek Group*, 123 F.3d at 403).

Generally, in the absence of any SEC regulation or legal authority requiring that an

issuer disclose certain information, there is no duty to do so under §§ 11 or 12(a)(2).  *In*

---

[14]Despite Plaintiffs' assertion that this case is analogous to insider trading, they offer no legal support for that proposition.  (Pls.' Resp. At 17-18.)  Thus, only the latter two situations are applicable here.

12

*re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 249 (S.D.N.Y. 2003).  Plaintiffs have not cited any portion of the applicable SEC regulations that cover required disclosures, Regulation S-K, 17 C.F.R. § 229.10, *et seq.*, that would support a duty to disclose a parent company's financial information.[15]  On the other hand, Defendants note that 17 C.F.R. § 229.101(b)(2)(c)(vii) mandates that an issuer disclose the identity of certain major customers, but stops short of requiring that any financial information about those customers be disclosed.  Defendants argue that they met this requirement by disclosing GMAC's reliance upon GM as a key revenue source, and further argue that since nothing in Regulation S-K requires actual disclosure of an outside entity's financial statements, this indicates that Defendants met their duty here.

In terms of case law citations, Plaintiffs' authority involves situations where the defendant misrepresented a material fact by not adequately explaining statements that were made in its SEC filings.  Put another way, Plaintiffs' cases on this point more appropriately address the question addressed in the next subsection–whether GMAC's non-disclosure of GM financial results made its other statements misleading.  Therefore, Plaintiffs have not stated any regulatory or judicial authority specifically supporting their proposed duty to disclose.[16]

---

[15]Plaintiffs do make a general citation to 17 C.F.R. § 229.303, and quote part of the instructions to paragraph 303(a) to argue that GM-specific information should be included as "other statistical data that the registrant believes will enhance a reader's understanding of its financial condition."  Nothing in this regulation can be read to specifically create a duty upon GMAC to disclose its parent's information, however, as a review of the surrounding text confirms that this particular provision is discussing the *registrant's* financial condition.

[16]Still, Defendants admit that the securities laws mandate disclosure of firm-specific information that is peculiarly within the knowledge of a corporation.  (Defs.' Mot.

In conclusion, Plaintiffs have not introduced regulatory or judicial authority that indicates that they have a viable claim under §§ 11 and 12(a)(2) for Defendants' failure to uphold a duty of disclosure, under what appears to be a novel theory for attaching liability. Plaintiffs repeatedly assert the position that because the GM financial information was likely within the knowledge of several of GMAC's senior executives, that this should support a duty to disclose. The significant number of interlocking officers and directors between GMAC and GM, as well as the strong correlation between each others' credit ratings, provide a unique situation that might support an expansion of existing disclosure duties on these facts. Since Plaintiffs are claiming liability under §§ 11 and 12(a)(2), which essentially impose strict liability upon issuers for material misstatements or omissions, however, some legal authority beyond mere assertions

at 15.) *See Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 517 (7th Cir. 1989); *Epstein v. Washington Energy Co.*, No. C94-245D, 1994 WL 561075 at *4 (W.D. Wash. July 25, 2004), *aff'd*, 83 F.3d 1136 (9th Cir. 1996). In disputing that these conditions are not met with regards to GM's financial information, Defendants assert that this information is non-firm-specific as to GMAC, and that it was "peculiarly within the knowledge of GM, not GMAC." (Defs.' Mot. At 15, emphasis removed.) This position completely disregards the fact that at least six of GMAC's senior executives and directors were also high-ranking officers of GM, and presumably had access to financial information about that entity. Therefore, it is not beyond peradventure that at least some of GMAC's senior officers had knowledge of GM's financial condition.

Even if the overlap in senior executives between GMAC and GM meant that GM's financial information was known to GMAC, however, Plaintiffs' theory of liability still contains a disconnect in its attempt to show that GM financial information was firm-specific to GMAC. Despite the corporate parent-subsidiary relationship here, it is a stretch of the common meaning of the term "firm-specific information" to claim that this would include financial information about a related company that in a completely different line of business from GMAC in most respects. To hold that firm-specific information also comprises that of other affiliated entities would dramatically enlarge the scope of required disclosures under federal securities law, and this would not comport with the general focus of Regulation S-K, which is on the *registrant* itself, not all of its corporate affiliates.

14

that a duty should lie is crucial here.  At bottom, Plaintiffs have not shown that they have

a claim based upon Defendants' affirmative duty to disclose under §§ 11 and 12(a)(2).

### b.  Failure to Disclose GM's financial information did not make GMAC's statements misleading

In the alternative, Plaintiffs assert that Defendants were obligated to disclose GM's

financial information in order to make other statements in GMAC's SEC filings not

misleading.  Defendants contend that any GM-related statements made in their filings

simply referred to the correlation between GM's financial condition and that of GMAC,

and never indicated that GMAC was somehow warranting GM's financial statements.

As noted previously, Plaintiffs cite a number of misrepresentation cases to confirm

that subsidiary relationships can impose disclosure requirements under certain

circumstances, and that issuing companies may need to disclose additional information

that they know of in order to make other specific statements not misleading.  *See City of

Monroe*, 399 F.3d at 672 (holding that a reasonable jury could find that subsidiary-

Firestone's statement that "[w]e continually monitor the performance of all our tire lines,

and the objective data clearly reinforces our belief that these are high-quality, safe

tires," could be seen as misleading given that Firestone did not disclose other data that

cut the other way); *In re F&M Distributors, Inc. Sec. Litig.*, 937 F. Supp. 647, 653-54

(E.D. Mich. 1996) (Cook, C.J.) (finding that the plaintiffs stated a valid claim for relief by

alleging that the defendant's statement that profitable "'deal' buying" opportunities would

continue was misleading in light of the fact that the defendant did not disclose known

information that such buying opportunities were, in fact, decreasing at the time the

statement was made).

15

These cases, along with others that Plaintiffs cite, confirm that the proper focus rests on the *particular* statements that GMAC made related to GM, and whether those statements would be made misleading without specific disclosure of GM's accounting misstatements.  Plaintiffs' Complaint lists the following statements that GMAC made concerning GM (any emphases removed from originals):

> As the financing of GM manufactured vehicles comprises a substantial portion of [GMAC's] financing operations, any protracted reduction or suspension of GM's production or sales resulting from a decline in demand, work stoppage, governmental action, adverse publicity or other event could have a substantial unfavorable effect on [GMAC's] results of operations.

(Compl. ¶ 46 (quoting GMAC's FY 2002 10-K).)

> S&P indicated that the downgrade [in GMAC's credit rating during October 2002] was driven by cash flow and financial resource concerns at the Company's parent, General Motors.

(*Id.* ¶ 47 (quoting GMAC's FY 2002 10-K).)

> The downgrade of GMAC's ratings reflect the substantial linkages that exist between it and GM.  These ties are both operational and financial. GMAC provides financing for GM dealers and their customers, and the quality of its portfolio is influenced by its parent. . . .  Therefore, GMAC's ratings are tied to its parent's.   GMAC's ratings were downgraded as a result of the downgrades of GM's obligations.

(*Id.* ¶ 48 (quoting GMAC's June 13, 2003 Form 8-K).)

> In April 2003, [S&P] lowered its debt rating outlook on GMAC to negative from stable.  S&P indicated that the change in rating outlook was caused by concerns with how GM will fund its multibillion-dollar pension and retiree health care liabilities. . . . [Another bond rating agency] downgraded GMAC's senior debt from A to A(low), citing concerns with GM's profitability and financial profile.

(*Id.* ¶ 56 (quoting GMAC's 1Q 2003 10-Q).)

> [o]ur credit ratings are an assessment of our ability to pay our obligations. Consequently, real or anticipated changes in our credit ratings will generally affect the market value of your notes.

16

(*Id.* ¶ 58 (quoting the Second SmartNotes Prospectus).)

While GMAC's asset levels remain at record highs, the Company, beginning in the third quarter of 2003, has benefitted from a significant reduction in unsecured borrowing spreads consistent with the overall improvement in the capital markets and GM as an issuer, in particular.  The outlook for GM improved partially due to the significant progress made in funding GM's pension and postretirement obligations.

(*Id.* ¶ 62 (quoting GMAC's FY 2003 10-K).)

One of the most important aspects of GMAC's Financing operations is supporting the sale of GM vehicles through "wholesale" or "floor plan" financing, primarily to finance purchases by dealers of new and used vehicles manufactured or distributed by General Motors . . . .

(*Id.* ¶ 75 (quoting GMAC's FY 2003 10-K).)

[Moody's Spring 2005] downgrade of GMAC's ratings reflects the significant business and financial ties between GM and GMAC that influence GMAC's auto finance operations – its origination volumes, asset mix, and asset quality – and its capitalization.

(*Id.* ¶ 103 (quoting GMAC's April 6, 2005 Form 8-K).)

During 2004 and the first quarter of 2005, the Company continued to experience volatile unsecured credit spreads caused by negative credit rating agency actions related to the financial outlook of GM, its overall market position in the automotive industry and its burdensome health care obligations.

(*Id.* ¶ 106 (quoting GMAC's 1Q 2005 10-Q).)

Moody's Investors Service is reviewing for possible downgrade [several credit ratings of GM and GMAC].  Moody's said that the review is prompted by its concern that escalating incentives, shifting customer preference to more fuel efficient vehicles, and long-term pressure on GM's US market share will make it increasingly difficult for the company to deliver credit metrics that are consistent with [GM's current rating] by year end 2007.

\* \* \*

Moody's is also reviewing GMAC's ratings for possible downgrade, reflecting concerns at the GM level.  Significant business and financial ties between

17

> GM and GMAC link GMAC's ratings to those of its parent.

(*Id.* ¶ 108 (quoting a July 7, 2005 GM and GMAC press release).)

> [GMAC's credit rating downgrades during 2005] were a continuation of credit rating actions over the past few years caused by concerns as to the financial outlook of GM, including its overall market position in the automotive industry and its burdensome health care obligations, as well as the uncertainty surrounding the auto parts supplier Delphi and its impact on GM's financial condition. As a result of these ratings actions, our unsecured credit spreads widened to unprecedented levels in 2005.

(*Id.* ¶ 111 (quoting GMAC's FY 2005 10-K).)

While large in number, these disclosures are consistent in one particular respect–they simply refer to the ties between GMAC and its parent, GM, and disclose general risks in the latter's business that could affect GMAC's credit ratings. To be sure, GMAC's statements identify the importance of cash flow, the potential Delphi pension liability and GM's operating profitability as specific factors that could affect the credit ratings of both entities. Still, GMAC's disclosures are devoid of any further comment or representation as to the accuracy, validity, or even the amount, of any of these figures.

As the *City of Monroe* and *In re F&M* cases demonstrate, in order to maintain a claim for omission of a fact that would make other statements not misleading, any undisclosed information must relate to a particular disclosure that the defendant made. In *City of Monroe*, the specific statement from defendant Firestone that "objective data clearly reinforce[d]" the company's position that its tires were safe was rendered misleading by the omission of known studies that came to the opposite conclusion. Similarly, in *In re F&M*, the defendant took it upon itself to tout the company's ability to "'deal' buy" as a competitive advantage in the marketplace. The court held that a failure

18

to disclose internal knowledge that market factors would make deal buying more difficult in the future meant that a reasonable jury could find the first statement to be misleading without giving investors the true picture by also disclosing the second.

Defendants cite an additional case that further elucidates the point in the context of alleged non-disclosure of financial information.  *See In re WorldCom, Inc. Sec. Litig.*, 303 F. Supp. 2d 385, 390 (S.D.N.Y. 2004) (holding that UBS, a third-party underwriter that issued securities whose value depended entirely on the financial fortunes of WorldCom, was not liable for WorldCom's misstatements of its financial results because UBS never represented the accuracy of those financial statements).  The instant case is somewhat distinct from *WorldCom*, given the close ties between GMAC and GM that were not present in the arms' length relationship between UBS and WorldCom, but the main point regarding this issue of liability under §§ 11 and 12(a)(2) remains applicable.

To be clear, this particular avenue of §§ 11 and 12(a)(2) liability is markedly different from that discussed in the preceding subsection, where an issuer has an automatic duty of disclosure.  Here, an issuer need not disclose adverse information that it is aware of *so long as it never raises a potentially misleading topic in the first place*.  Therefore, since none of GMAC's statements included in the Complaint evince any intent to warrant GM's financial statements, or any particular figures within them, Plaintiffs have failed to state a claim for which relief can be granted under this alternative ground for non-disclosure liability under §§ 11 and 12(a)(2).

Accordingly, Defendants' motion to dismiss is GRANTED with regards to GMAC's non-disclosure of GM financial information concerning that entity's cash flows, its Delphi pension liability, and supplier credits.

19

### 2. Misrepresentation of GMAC's financial information

Turning from GMAC's non-disclosure of GM's financial information, Plaintiffs claim that Defendant GMAC and the Individual Defendants are also liable under §§ 11 and 12(a)(2) for misrepresenting GMAC's own revenues and net income during FY 2004.  In response, Defendants contend that (1) these misstatements were not actionable because they were not material, and (2) the misstatements did not cause Plaintiffs' losses because any downgrades to GMAC's credit ratings were based solely upon GM's financial troubles.

As noted previously, GMAC admits that it misrepresented its FY 2004 financial results as follows: (1) once restated, net revenues decreased by $26 million (0.5%), $12 million (0.2%) and $41 million (0.8%) for 1Q, 2Q and 3Q, respectively, and (2) restated net income decreased by $22 million (2.8%), $14 million (1.6%) and $36 million (5.5%) for the same respective periods.  (Compl. ¶ 96.)  Simply because a fact is misstated does not lead to a violation of §§ 11 and 12(a)(2), however, as the Supreme Court has explained that such statements are only actionable if the plaintiff can "show that the statements were *misleading* as to a *material* fact.  *Basic, Inc. v. Levinson*, 485 U.S. 224, 238 (1988) (emphasis in original).  A fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 231 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1987)).  Since materiality is an objective standard, this usually raises a disputed issue of fact that would render dismissal as a matter of law inappropriate.  The Sixth Circuit, along with a number of its sister circuits, however, have recognized that this issue can be decided on

20

a motion to dismiss.  *Benzon v. Morgan Stanley Distribs., Inc.*, 420 F.3d 598, 608-09 (6th Cir. 2005).  *See also Greenhouse v. MCG Capital Group*, 392 F.3d 650, 657 (4th Cir. 2005) (collecting cases from the Third and Fourth Circuits);  *DeMaria v. Andersen*, 318 F.3d 170, 182 (2nd Cir. 2003); *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1189 (11th Cir. 2002); *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1997).

In framing the relative importance of the particular figures that GMAC misrepresented to a debt securities investor, Defendants assert that such investors are typically focused more on the issuer's cash flow rather than income statement items such as revenues or net income.  This contrasts with a situation involving an equity investor, where otherwise small adjustments to these categories might be material due to their importance in valuing the issuer's equity securities.  As noted by the Second Circuit in a case involving a company inflating its net income figures:

> [This] would be relevant to purchasers and holders of equity securities interested in earnings per share and price/earnings ratios, but [] would be less relevant to sophisticated purchasers of privately-placed debt securities.

*AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 231 (2nd Cir. 2000).  Similarly, the Third Circuit has stated:

> The market price of [a] bond, assuming the issuer is solvent, will be primarily a function of the market interest rate. A prospectus containing representations about earnings potential which might be of material interest to a stockholder would, in all likelihood, be of no interest to the bondholder. This is because the bondholder will be paid his principal and interest regardless, and the market price of his security will be determined by factors external to the corporation's earnings.

*Kusner v. First Pennsylvania Corp.*, 531 F.2d 1234, 1237 (3rd Cir. 1976).

Plaintiffs are correct in noting that the *Kusner* court was not directly addressing the issue of materiality that is at bar here.  In addition, that court's discussion involved an

21

example designed to differentiate the convertible debt securities at issue in that case with traditional bonds that are not convertible into equity, such as those that GMAC issued.  Furthermore, Plaintiffs assert that *AUSA Life Insurance* is also distinguishable, because the district court below based its finding on expert testimony that had been presented, while no expert testimony is on the record here.

Regardless of the specific scenario in which the Second and Third Circuits made these observations, the main point about the general information of interest to investors in two distinct classes of securities remains applicable.  Additionally, the basic valuation methodologies for equity and debt securities (i.e. that equity securities derive their value primarily from the issuer's future earnings potential, but debt securities depend on an issuer's credit rating and market interest rates) are not something that necessitates expert testimony in each case.  Even the Complaint recognizes that "[a] critical component to any assessment of a debt security's yield [and therefore, its value,] is the credit quality of the issuer.  The credit quality of an issuer is based, in large part, on the difference between the market value of its assets and its debt – sometimes described as the 'equity cushion.'" (Compl. ¶¶ 36-37.)[17]

Numerous courts have found that certain percentage changes to a company's reported financial statements were immaterial as a matter of law.  *See Romine v. Acxiom Corp.*, 296 F.3d 701 (8th Cir. 2002) (holding that a $2.3 million restatement amounting to a 1.1% reduction in quarterly revenues and 14.6% decline in quarterly net income was immaterial to equity investors); *Glassman v. Computervision Corp.*, 90 F.3d

---

[17]Income figures would certainly affect an issuer's equity cushion in some manner, but they would not be a "critical component" or "large part" of this metric.

22

617, 633 (1st Cir. 1996) (finding that a quarter-to-quarter change in the defendant's backlog was immaterial to investors in a mixed debt and equity offering because the change only constituted 3% of quarterly revenues); *Taubenfeld v. Hotels.com*, 385 F. Supp. 2d 587, 594 (N.D. Tex. 2004) (holding that a 1.5% reduction in quarterly revenues was immaterial to equity investors).

In response, Plaintiffs make a gross misrepresentation of their own when they assert "[a] restatement of financial results raises *a presumption* of both falsity and materiality for pleading purposes." (Pls.' Resp. at 19, emphasis in original) (citing *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 437 (S.D.N.Y. 2005)). A review of that case, made more difficult by Plaintiffs' failure to include a pin cite, indicates that the court was only discussing the question of whether an alleged statement was "false and misleading," and not whether it was material. *Id.* The court did discuss "material accounting errors," but made no mention of the materiality standard covered in *Basic* and at issue here.

Plaintiffs also argue that because Generally Accepted Accounting Principles, and specifically, ¶ 38 of Accounting Principles Board Opinion 20, (Defs.' Mot., Ex. E) require restatement of a material error in a company's financial statements, that this is sufficient to make GMAC's misrepresentations material here. Essentially, Plaintiffs argue that, because GMAC restated revenues and net income, those changes must have been material. While these changes may have been material from an *accounting* perspective, Plaintiffs' brief is bereft of any *legal* authority to support its attempted alchemy of transforming an accounting standard into a principle of federal securities law, so this argument is without merit.

23

Under the reasoning of the applicable cases already mentioned, GMAC's misrepresentations relating to its quarterly revenue figures were immaterial as a matter of law, as none of them exceeded 0.8%. While the discrepancies in GMAC's net income numbers for these periods were off by as much as 5.5%, which would arguably be material to an equity investor, the fact that Plaintiffs in this action invested in debt securities convinces the Court that these misstatements would not be material to a reasonable investor in Plaintiffs' position. Therefore, GMAC's motion to dismiss is GRANTED as to Plaintiffs' §§ 11 and 12(a)(2) claims that are based upon GMAC's misstatement of its own FY 2004 financial results.[18]

### C.  Whether Defendants Were Statutory Sellers of the Second SmartNotes

In their motion to dismiss, Defendants assert that Defendant GMAC and the Individual Defendants were also not liable under § 12(a)(2) because they were not "sellers," as defined by the Securities Act, due to the fact that the securities at issue were sold through firm commitment underwritings. Although this alternative defense is irrelevant now that the Court has dismissed Plaintiffs' §§ 11 and 12(a)(2) claims on the merits, Defendants admit in their Reply Brief that some of the debt securities issuances listed in the Complaint, including the Second SmartNotes, were, in fact, sold directly to the initial purchasers. (Defs.' Reply at 14 n.6.) This means that Defendants were statutory sellers of the relevant securities, so their argument is without merit anyway after this admission.

---

[18]As a misstatement is not actionable once it is immaterial, the Court need not address Defendants' alternative argument that the GMAC misrepresentations did not cause Plaintiffs' losses.

### D.  Control Person Liability Under § 15 of the Securities Act

Plaintiffs final claim, against Defendant GM and the Individual Defendants, is for control person liability under § 15.  Both parties' briefs in this matter note that a § 15 claim is wholly derivative of a defendant's primary liability under §§ 11 or 12(a)(2), and that if no other Securities Act claim exists under either of these sections, then the § 15 claim fails automatically as a matter of law.  As the Court has determined that Plaintiffs have not stated valid §§ 11 and 12(a)(2) claims, their § 15 claim must also be DISMISSED.

## IV.  CONCLUSION

Being fully advised in the premises, having read the pleadings, and for the reasons set forth above, the Court hereby orders as follows:  Defendants' motion to dismiss is GRANTED and this case is DISMISSED.

SO ORDERED.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge


Dated:  February 27, 2007

I hereby certify that a copy of the foregoing document was served upon counsel of record on February 27, 2007, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager